D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
DANIELLE DORGAN,

               Plaintiff,

    -against-

SUFFOLK COUNTY COMMUNITY COLLEGE,
SUSAN LIEBERTHAL,

               Defendants.
---------------------------------------------------------X

**ORDER**
12-CV-0330 (SJF)(ARL)

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ AUG 04 2014 ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

On January 24, 2012, plaintiff Danielle Dorgan ("plaintiff") commenced this action against Suffolk County Community College ("SCCC") and Susan Lieberthal ("Lieberthal") (collectively, "defendants"), alleging, *inter alia*, employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the New York State Human Rights Law, 15 N.Y. Exec. § 290 *et seq.* ("NYSHRL"). [Docket Entry No. 1]. Now before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Docket Entry No. 35]. For the reasons that follow, defendants' motion is granted.

I.    Factual Background[1]

Plaintiff began working at SCCC in 1999 as a Professional Assistant I. (Defs.' 56.1 Stmt. ¶ 4). In 2006, plaintiff was promoted to the position of Professional Assistant II, which she still

---

[1] The facts are taken from the undisputed statements in Defendants' Statement Pursuant to Local Rule 56.1 ("Defs.' 56.1 Stmt.") [Docket Entry 35-9], Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl.' 56.1 Stmt.") [Docket Entry No. 36-2], the declaration of Elaine M. Barraga in support of defendants' motion for summary judgment ("Barraga Decl.") [Docket Entry No. 35-1] and the exhibits attached thereto, Plaintiff's Affidavit in Opposition to Defendants' Summary Judgment Motion ("Pl.' Aff.") [Docket Entry No. 36-1], and my review of the record.

holds today. (Defs.' 56.1 Stmt. ¶¶ 3, 5-6; Barraga Decl., Ex. A ("Pl. Depo."), at 10-11). As a Professional Assistant II, plaintiff is responsible for writing up technical manuals for computer installation, repairing and diagnosing computers, traveling in the field for faculty, and replacing monitors and parts of the computers. (Defs.' 56.1 Stmt. ¶¶ 7-8). Plaintiff's normal working hours were 8:00 a.m. to 4:00 p.m. (Defs.' 56.1 Stmt. ¶ 9; Pl.' 56.1 Stmt. ¶ 9; Pl. Depo., at 14-15).

In 2005, plaintiff was diagnosed with bipolar II disorder, which is characterized by severe depression and anxiety. (Pl.' 56.1 Stmt. ¶ 81). The side effects of the medication plaintiff took to treat her bipolar disorder made it difficult for plaintiff to get to work because she would sometimes have to wait until the medication kicked in or adjusted so she could drive. (Defs.' 56.1 Stmt. ¶¶ 10-11). According to plaintiff, she was able to manage her symptoms in order to come to work up until June 2006, when she became unable to work because of her bipolar disorder. (Id. ¶¶ 14, 16). However, plaintiff began to miss a significant amount of work as early as March 2006. (Barraga Decl., Ex. B (Record of Time Off, September 2005 – August 2006)).[2] In May 2006, plaintiff did not come to work on May 1, 8, 15, 16, 17, 18, and 19. (Defs.' 56.1 Stmt. ¶ 13). In June 2006, plaintiff was absent for half of the day on June 6, 13, and 15, and did not attend work on June 2, 16, 19, 20, 21, and 22. (Barraga Decl., Ex. B).

On June 23, 2006, plaintiff was admitted to the John T. Mather Memorial Hospital ("Mather Hospital") where she received in-patient treatment through June 28, 2006, and received outpatient treatment thereafter. (Barraga Decl., Ex. C. (Mather Hospital Discharge Summary); Pl.' 56.1 Stmt. ¶¶ 15, 20). Plaintiff did not work for the month of July 2006. (Defs.' 56.1 Stmt. ¶ 18). By letter dated July 27, 2006, Dr. Piotr Olkowski informed SCCC of plaintiff's diagnosis

---

[2] In 2006, plaintiff missed work from March 1 through March 17, and again on March 20, 23, and 27 through 29. (Id.). In April 2006, plaintiff missed a total of five (5) days of work. (Id.)

2

of bipolar II disorder, that plaintiff had successfully completed an outpatient program, and that "[s]he may return to work full-time without restrictions." (Barraga Decl., Ex. E (Dr. Olkowski Letter, July 27, 2006); Defs.' 56.1 Stmt. ¶¶ 21-22). Despite Dr. Olkowski's July 27, 2007 letter clearing plaintiff to return to work, plaintiff was not permitted to return to work until she submitted to an examination by a physician designated by SCCC, which was not scheduled until August 2006. (Pl.' 56.1 Stmt. ¶ 19; Pl.' Aff. ¶ 6). As a result, plaintiff did not work for the month of August 2006. (Pl.' 56.1 Stmt. ¶ 19; Pl.' Aff. ¶ 6).

On September 25, 2006, plaintiff entered into a Memorandum of Understanding ("MOU") with SCCC, wherein plaintiff, who had "been on extended sick leave since June 16, 2006," agreed, *inter alia*, to sign in and out of work, notify her supervisor upon arrival at a job location and completion of an assignment, and inform her supervisor at least thirty (30) minutes before the start of her work day if she could not come to work on a scheduled day. (Barraga Decl., Ex. F (MOU, Sep. 25, 2006); Pl.' 56.1 Stmt. ¶ 23). On October 23, 2006, plaintiff was sent a disciplinary memorandum from her supervisor, which noted that plaintiff's hours had been changed from 8:30 a.m. to 4:30 p.m.[3] (Barraga Decl., Ex. G (Disciplinary Memo, Oct. 23, 2006)). The October 23, 2006 memorandum notified plaintiff that she had arrived to work late on September 26, 28, and 29, and October 3, 4, 5, 9, 10, 12, 13, and 18, without notifying her supervisor before the start of her shift. (*Id.*). The October 23, 2006 memorandum also informed plaintiff that she failed to report to work on October 11 and 19, 2006, without notifying her supervisor that she could not come to work on those days. (*Id.*).

---

[3] According to plaintiff, because her medication "limited [her] ability to drive to work," she "requested a fifteen minute grace period in order to make sure [she] arrived to work safely. In response, the [SCCC] modified [her] schedule and set [her] start time to one half hour later." (Pl.' Aff. ¶ 8).

3

On December 1, 2006, plaintiff was sent another disciplinary memorandum from her supervisor, which noted that plaintiff was late on October 23, 24, 25, 27 and 31, November 2, 6, 8, 10, 13, 21, 22, 27, 29, and 30, and December 1, 2006, and with the exception of three (3) of those instances, plaintiff did not notify her supervisor before the start of her shift that she would be late. (Barraga Decl., Ex. K (Disciplinary Memo, Dec. 1, 2006)). The December 1, 2006 memorandum also informed plaintiff that she was absent on October 20, and November 1, 14, 15, 20, and 28, and warned plaintiff that if "this pattern of tardiness and absenteeism does not significantly improve by January 12, 2007, you will suspended [sic] without pay for one week on or after that date." (*Id.*).

On January 4, 2007, plaintiff once again failed to report to work. (Defs.' 56.1 Stmt. ¶ 28). On January 13, 2007, plaintiff was admitted to Mather Hospital for in-patient treatment, and was discharged on January 22, 2007. (*Id.* ¶ 29). On January 23, 2007, plaintiff began receiving out-patient treatment, but was readmitted on February 12, 2007 for in-patient treatment "after threatening suicide and reporting homicidal ideations towards her boss." (Barraga Decl., Ex. I (Mather Hospital Discharge Summaries); Defs.' 56.1 Stmt. ¶ 30). Plaintiff was subsequently discharged from Mather Hospital on February 22, 2007. (Barraga Decl., Ex. I; Defs.' 56.1 Stmt. ¶ 30).

On January 16, 2007, SCCC sent a letter to plaintiff advising her that disciplinary charges had been filed against her for her continued tardiness and absenteeism. (Barraga Decl., Ex. J (SCCC Disciplinary Letter, Jan. 16, 2007)). The letter noted that since plaintiff had returned to work on September 26, 2006, she was late approximately thirty-two (32) times and absent approximately nine (9) days. (*Id.*). Furthermore, the letter explained that since being warned that she would be suspended for one (1) week without pay if her absenteeism and tardiness did

not improve, plaintiff was late approximately fifteen (15) times and absent from work on approximately six (6) days, and therefore, a disciplinary hearing was scheduled for February 1, 2007. (*Id.*). Plaintiff denies receipt of this letter given that it was sent during her hospitalization at Mather Hospital.[4] On February 16, 2007, SCCC sent plaintiff another letter, advising her to report to work on February 22, 2007 or to provide medical documentation for her absence. (Defs.' 56.1 Stmt. ¶ 35).[5]

On March 7, 2007, SCCC sent a letter advising plaintiff that failure to provide SCCC, within ten (10) calendar days, "with medical documentation or an explanation for your absence from January 4, 2007 to the date of this letter and with an expected date of return" would result in the termination of her employment. (Barraga Decl., Ex. L (Letter Re: Job Abandonment, Mar. 7, 2007)).[6] By letter dated March 20, 2007, SCCF terminated plaintiff's employment for job

---

[4] However, plaintiff's representations about receipt of this letter are inconsistent. In her affidavit submitted in opposition to defendants' summary judgment motion, plaintiff denies receipt of the January 16, 2007 letter altogether. (Pl.' Aff. ¶ 11). Yet, in her Rule 56.1 Statement, she "denies receipt of this letter until after her discharge from the hospital in February, 2007." (Pl.' 56.1 Stmt. ¶ 33). During her deposition, plaintiff stated that while she was receiving outpatient treatment, she received a letter from SCCC which led to her involuntary readmission to Mather Hospital. *See* Pl. Depo, at 55-56 ("I was inpatient, and I was doing outpatient. I got a letter from work saying that if I didn't report the next day that I would be terminated. I went into inpatient to get my medication to tell them . . . I'm leaving, I have to go back to work. Their response was, you work for the county, you're tenured, you're covered, you're not going anywhere. They locked me in the room, took my car keys away, and paddy wagoned me back in."). Plaintiff was involuntarily readmitted on February 12, 2007, and was not sent another letter from the SCCC until February 16, 2007. Following plaintiff's discharge on February 22, 2007, plaintiff was not involuntarily readmitted to Mather Hospital again. Thus, in light of these facts, plaintiff's reference to a letter at her deposition could only be to the January 16, 2007 letter.

[5] Plaintiff received this letter on February 22, 2007 following her discharge from Mather Hospital. (Pl.' Aff. ¶ 12).

[6] Furthermore, the letter provided plaintiff with "official notice that pursuant to Article 6, Section 6.4 Abandonment of the collective bargaining agreement between the Faculty Association and the [SCCC], your absence from work without notice to the [SCCC] for 10 consecutive calendar days when assigned is deemed absent without authorization." (*Id.*). The letter also informed plaintiff that "[y]ou have been out of work since January 4, 2007 without documentation and, to date, you have not returned to work nor have your provided medical documentation or an explanation for your absence." (*Id.*).

5

abandonment, effective March 19, 2007, due to her failure to comply with its requests for "medical documentation for [her] absence from work since January 4, 2007." (Barraga Decl., Ex. M (Termination Letter, Mar. 20, 2007); Defs.' 56.1 Stmt. ¶ 36).

On April 11, 2007, plaintiff wrote to Dr. Shirley Pippins, SCCC's President at the time, explaining her situation and requesting that her employment not be terminated (the "Appeal"). (Barraga Decl., Ex. O (Letter Appealing Termination, Apr. 11, 2007)). On May 1, 2007, before a determination was issued on plaintiff's Appeal, the Faculty Association filed a grievance on behalf of plaintiff alleging that "the [SCCC] violated the collective bargaining agreement when it terminated [plaintiff] without cause" (the "Grievance"). (Barraga Decl., Ex. Q (Faculty Association Grievance, May 1, 2007)). On May 30, 2007, Dr. Pippins denied plaintiff's Appeal and affirmed the decision to terminate plaintiff's employment for job abandonment. (Barraga Decl., Ex. P (Denial of Appeal, May 30, 2007); Defs.' 56.1 Stmt. ¶ 39).

On January 7, 2008, before obtaining a determination on the Grievance, plaintiff submitted a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia*, that since SCCC "found out that [she] had Bi-Polar in June, 2006 they tried everything in their power to terminate [her] or make [her] quit," and that she "was terminated when [she] became ill on March 19, 2007" (the "EEOC Charge"). (Barraga Decl., Ex. S (EEOC Charge), at 9, 12). At the time she filed the EEOC Charge, plaintiff affirmed that there were no restrictions due to her illness. (EEOC Charge, at 9; Defs.' 56.1 Stmt. ¶ 45).

On June 11, 2008, a hearing was held on the Grievance to determine whether SCCC "violate[d] Article 6, Section VI of the collective bargaining agreement when it terminated [plaintiff's] employment on/or about March 19, 2007" and "[i]f so, what [the remedy] shall be." (Barraga Decl., Ex. R (Arbitration Decision, Aug. 20, 2008), at 2). On August 20, 2008, the

arbitrator sustained plaintiff's Grievance and ordered that plaintiff's employment "be reinstated and made fully whole for all losses associated with this action, retroactive to the date of her termination" ("Arbitration Decision"). (*Id.* at 13).[7]

In compliance with the Arbitration Decision, plaintiff was reinstated and returned to work by "late September, October" 2008 and received back pay. (Pl. Depo, at 59-60; Pl.' 56.1 Stmt. ¶ 43). During her deposition, plaintiff affirmed that she was "made whole financially." (Pl. Depo., at 59 ("Q. So, you were made whole financially? A. Yes.")). Yet, plaintiff now disputes this assertion, and contends that while she did receive retroactive back pay, "she did not receive reimbursement for medical expenses during the time she was terminated, pension distributions taken to cover her living expenses and other expenses incurred while not working." (Pl.' 56.1 Stmt. ¶ 43). When plaintiff was reinstated, she chose a 9:00 a.m. start time. (*Id.* ¶ 61). Upon returning to work in 2008, plaintiff did not file any grievances through her union,[8] felt as though work was going well, and that she could perform the functions of the job without the need for an accommodation. (Pl.' 56.1 Stmt. ¶¶ 51-52; Pl. Depo., at 62.).

In 2009, plaintiff was involved in an automobile accident, which caused sleep deprivation that "threw [her] bipolar off track" and triggered her anxiety. (Defs.' 56.1 Stmt. ¶¶ 56-57).

---

[7] The Arbitration Decision summarized the relief requested by the Faculty Association on behalf of plaintiff: "the Association asks that Grievant be reinstated, and made whole retroactive to the date of her termination," including "that she be reimbursed for any COBRA premiums paid or medical expense incurred in lieu thereof, [and] that her New York State pension rights and Union Benefit Trust Fund rights be restored retroactively." (Arbitration Decision, at 9).

[8] While plaintiff does not dispute this fact, she claims that while waiting for the EEOC to issue a right to sue letter (which she contends was eventually issued in October 2011, more than (3) years after she filed her EEOC Charge), she "repeatedly updated the EEOC on the retaliatory acts undertaken by the [SCCC] after my return and the consistent pattern of humiliating me for my disability." (Pl.' Aff. ¶ 22). While plaintiff purports that "[t]hese retaliatory acts were outlined in several exchanges between my attorney and the EEEOC during the conciliation process and were disseminated to the Defendants by the EEOC," plaintiff has not submitted these purported exchanges or a right to sue letter issued by the EEOC. (*Id.*).

Plaintiff again began having issues reporting to work because the anxiety caused her to throw up and "poop her pants." (*Id.* ¶¶ 55, 58). As a result, plaintiff requested an accommodation for a "15-20 minutes leeway, if needed," "in which to clean herself up in the event she was sick while driving." (Pl.' 56.1 Stmt. ¶¶ 59-60). Plaintiff was granted several accommodations, in which her start time was changed from 9:00 a.m. to 9:15 a.m., and ultimately changed until 10:00 a.m. (Defs.' 56.1 Stmt. ¶¶ 62-63). However, plaintiff "never requested a pushed back start time," but instead, she "was asking for [] a few extra minutes to get cleaned up and change my clothes." (Pl.' Aff. ¶ 32). Plaintiff's request was for a "15 minute leeway, whether [she] ha[d] to report there at 8:00 a.m., or 9:00 a.m., or 10:00 a.m." (Pl. Depo., at 96-97).

On September 29, 2010, the EEOC issued a probable cause determination on plaintiff's EEOC Charge pertaining to the events that occurred before January 2008, and concluded that SCCC was "aware of [plaintiff's] disability during her medical absence," and "failed to provide plaintiff with an accommodation and terminated her during her medical absence." (Barraga Decl., Ex T (EEOC Determination), at 2).

Plaintiff stopped working in November 2010 because of the "[c]ombination of [her] legs [which she injured in the car accident] and [her] bipolar." (Pl. Depo., at 83). Plaintiff has not returned to work since November 2010 (Defs. 56.1 Stmt. ¶¶ 67, 74), because she will "not jeopardize screws popping out" by lifting computers and also because of "[t]he bipolar," which makes her "scared to go back to work there." (Pl. Depo., at 88). On November 19, 2010, plaintiff took a leave of absence pursuant to the Family Medical Leave Act, which ended after twelve (12) weeks on February 12, 2011. (Defs.' 56.1 Stmt. ¶ 73). On February 10, 2011, plaintiff had exhausted all of her sick-time accruals, and began receiving half-pay benefits in accordance with the Faculty Association contract. (*Id.* ¶ 76). On March 20, 2011, plaintiff

began receiving disability benefits, in addition to her half-pay benefits. (*Id.* ¶ 77). As of July 21, 2011, plaintiff no longer received half-pay benefits, but continued to receive her disability benefits. (*Id.* ¶ 78). On April 24, 2013, plaintiff's disability payments ended in accordance with the Faculty Association contract. (*Id.* ¶ 79). Plaintiff remains an employee of SCCC as a Professional Assistant II. (*Id.* ¶ 80). Plaintiff's doctors are not yet able to clear her for work because of her surgery and her bipolar disorder. (Pl. Depo., at 91-92). Plaintiff contends that while she is "still technically employed by the SCCC, [she] is not permitted to report for work while [she] utilize[s] a cane," and that "[t]o this day, SCCC and Ms. Lieberthal will not allow me to report for work." (Pl.' Aff. ¶ 31).

On January 24, 2012, plaintiff commenced this action against SCCC and Leiberthal, in which she reasserts the allegations at issue in the Arbitration Decision, and claims that upon her return to work in 2008, she was "subjected to a course of conduct undertaken to humiliate [her] and to drive her out of her position." (Compl., ¶ 20). Plaintiff asserts that defendants "subject[ed] [her] to discrimination and terminat[ed] [her] based on her actual and/or perceived disability and/or record of impairment and in retaliation for requesting reasonable accommodation," in violation of the ADA.[9] (Id. ¶ 22). Plaintiff seeks to be compensated with: (i) "a rate of pay and other benefits and emoluments of employment, to which she would have

---

[9] While plaintiff labels Count II as NYSHRL claims, the paragraphs that make up Count II repeat, verbatim, the allegations of ADA violations from Count I. *See* Compl. ¶¶ 25-28. Nowhere in the Complaint does plaintiff identify a specific provision of the NYSHRL that was purportedly violated by defendants. Furthermore, plaintiff's opposition to defendants' motion for summary judgment solely focuses on the prima facie elements of an ADA discrimination claim. Plaintiff makes no arguments regarding retaliation (under either the ADA or NYSHRL) or her NYSHRL discrimination claim. *See* Pl.' Memo. of Law in Opp. to Defs.' Mot. for Summ. J. ("Opp.") [Docket Entry No. 36-3]. Accordingly, the Court deems plaintiff's ADA retaliation and NYSHRL claims to be abandoned. *See Blouin ex rel. Estate of Pouliot*, 356 F.3d 348, 363 n.9 (2d Cir. 2004) (deeming plaintiff's state claims abandoned because "[a]lthough mentioning [those] claims, [plaintiff] provides no argument concerning them" (citing *Taylor v. Rodriguez*, 238 F.3d 188, 196-97 (2d Cir. 2001))).

9

been entitled, has [sic] she not been subjected to Defendant's unlawful employment practices"; (ii) "an award of front pay"; and (iii) "punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable." (Compl., at 7).

II. Discussion

   A. Standard of Review

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (internal quotation marks and citation omitted); *see also Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citation omitted). If this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358 (citation omitted). In order to defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) ("At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks and citation omitted)).

### B. ADA Claims

The ADA prohibits discrimination against a "qualified individual on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[10] "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009). Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination," after which the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). "If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons

---

[10] Prior to the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), the ADA prohibited employment discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (1990).

11

offered by the defendant were not its true reasons, but were a pretext for discrimination." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks and citation omitted).

"A plaintiff asserting a violation of the ADA must prove that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005). In seeking summary judgment on plaintiff's discrimination claim, defendants argue, *inter alia*, that: (i) plaintiff is not disabled within the meaning of the ADA, and (ii) she was unable to perform the essential functions of her job.

1. "Disability" Within the Meaning of the ADA

Under the ADA, the term "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of having such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).[11] Plaintiff contends that her bipolar disorder substantially limits her ability to

---

[11] The ADA was amended in 2008 to convey congressional intent that, *inter alia*, "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis," and instead, the focus of "cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations." ADAAA § 2(b). While the ADAAA retained the same pre-amendment definition of disability, it directs that such definition "shall be construed in favor of broad coverage of individuals," and provides, *inter alia*, a non-exhaustive list of "major life activities," an expansion of the "regarded as having such an impairment" prong, and clarifies that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." ADAAA § 4(a).

It is well-settled that the 2008 amendments to the ADA do not operate retroactively, and that a plaintiff's claims are to be evaluated under "the version of the [ADA] in effect during the period at issue." *Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 622 (2d Cir. May 23, 2013). While plaintiff's EEOC Charge, filed January 7, 2008, relates solely to events that took place before the ADAAA became effective on January 1, 2009, plaintiff claims that she continued to update the EEOC regarding events that

12

work and drive.[12] Opp., at 8. Specifically, plaintiff argues that the "recurring nature of [her] depression and anxiety, even while taking medication, limited her ability to be present at work and to be on time for work." *Id.* at 8. The ADA specifically lists working as a major life activity. *See* 42 U.S.C. § 12102(2)(A).

There is no question that plaintiff's medical records demonstrate that her bipolar disorder required her to be hospitalized and left her unable to work.[13] Defendants argue that plaintiff herself admitted "her condition was temporary at best and she felt as though she could work and perform the functions of her job." Defs.' Memo of Law in Supp. Of Mot. for Summ. J. [Docket Entry No. 35-8], at 13. However, under the ADA, an impairment may constitute a disability even if it "is episodic or in remission." 42 U.S.C. § 12102(4)(D). In any event, the Court need not determine whether plaintiff's bipolar disorder qualifies as a "disability" under the ADA because plaintiff has not otherwise established a prima facie case of ADA discrimination.

---

occurred until the EEOC issued her a right to sue letter in October 2011. *See* Pl. Aff. ¶ 22. Even though plaintiff has submitted neither a right to sue letter nor documentation regarding these alleged updates to the EEOC, the Court will consider these allegations as "sufficiently related to the allegations in the [EEOC] charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003). Accordingly, the Court will evaluate plaintiff's claims under the ADA as amended in 2008.

[12] Plaintiff states that the medication taken to treat her condition, as well as the anxiety she suffered, left her unable to drive. Opp., at 8. Plaintiff provides no support for her contention that driving is a major life activity as contemplated by the ADA. Indeed, other courts have held that driving does not constitute a major life activity. *See e.g., Hawkins v. Social Sec. Admin.*, 368 F. App'x 136, 140 (Fed. Cir. Mar. 5, 2010) ("[O]ur sister circuits have held that driving oneself is not a major life activity."); *Kellogg v. Energy Safety Servs., Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008) ("We hold that driving oneself is not a major life activity."), *cert. denied*, 556 U.S. 1167, 129 S.Ct. 1916, 173 L.Ed.2d 1059 (2009); *Robinson v. Lockheed Martin Corp.*, 212 F. App'x 121, 124 (3rd Cir. Jan. 8, 2007) ("[D]riving is not a major life activity.").

[13] *See* Barraga Decl., Ex. C (Mather Hospital Discharge Summary) (documenting plaintiff's hospitalization for bipolar disorder from June 23, 2006 through June 28, 2006); *id.*, Ex. E (Dr. Olkowski Letter, July 27, 2006) (doctor clearing plaintiff to return to work on July 27, 2006 following her June 2006 hospitalization); *id.*, Ex. I (documenting plaintiff's hospitalizations from January 13, 2007 through January 22, 2007 and February 12, 2007 through February 22, 2007, and noting that "patient has been intermittently unable to work").

## 2. Qualified to Perform Essential Functions of Job

Assuming, *arguendo*, that the Court were to conclude that plaintiff's bipolar disorder constitutes a "disability" as defined by the ADA, plaintiff's claim would still fail because she has not proven that she "was qualified to perform the essential functions of [her] job, with or without a reasonable accommodation." *Capobianco*, 422 F.3d at 56. The undisputed evidence demonstrates that plaintiff was offered numerous reasonable accommodations, which ultimately resulted in her start time being delayed by two (2) hours.[14] The Court agrees with defendants that "[p]laintiff's claim that even though she was granted several extensions of her start time, she still needed an additional 15 minute grace period is simply illogical as she, and she alone, determined when she began her commute to work each morning and could have left her home 15 minutes earlier." Defs.' Rep. Mem. Of Law in Supp. Of Mot. for Summ. J. [Docket Entry No. 37], at 7. Despite receiving these reasonable accommodations, plaintiff has not worked since November 2010.

"Courts have consistently ruled that 'an employee cannot be considered otherwise qualified when she is unable to report to work at the time required, because she is not able to perform the essential functions of her job.'" *Lewis v. N.Y. City Police Dep't*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012), *aff'd sub nom. Lewis v. NYC Police Dep't*, 537 F. App'x 11 (2d Cir.

---

[14] Plaintiff was not satisfied with these accommodations and wanted a fifteen (15) minute leeway, regardless of the time she was required to report to work. *See* Pl.' Aff. ¶ 32 ("I never requested a pushed back start time. . . . All I was asking for was a few extra minutes to get cleaned up and change my clothes. I could not, and still can not, make the College understand this."); Pl. Depo., at 96-97 (plaintiff requested an accommodation of a "15 minute leeway, whether [she] ha[d] to report there at 8:00 a.m., or 9:00 a.m., or 10:00 a.m.")). However, plaintiff's "preference for a [15 minute leeway] does not render unreasonable an otherwise reasonable accommodation." *Hamedl v. Verizon Commc'ns, Inc.*, 557 F. App'x 68, 70 (2d Cir. Feb. 20, 2014); *see also Fink v. N.Y. City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) (noting that a reasonable accommodation "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable").

Nov. 1, 2013) (internal quotation marks and citation omitted); *see also Micari v. Trans World Airlines, Inc.*, 43 F. Supp. 2d 275, 281 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1323 (2d Cir. 1999) (holding plaintiff's "failure to report for work . . . provides an additional basis on which this Court can conclude that he was unable to perform the essential functions of his job"). "Indeed, courts have specifically noted that '[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability.'" *Lewis*, 908 F. Supp. 2d at 327 (quoting *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18 (S.D.N.Y. 1999)). Accordingly, plaintiff cannot demonstrate that she is able to perform the essential functions of her job, given that she has not reported to work in more than three (3) years. Therefore, defendants are entitled to summary judgment in their favor on plaintiff's ADA discrimination claim.[15]

III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted. The Clerk of the Court shall enter judgment accordingly and close this case.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: August 4, 2014
Central Islip, New York

---

[15] In light of this determination, the Court does not address defendants' remaining arguments, including the purported qualified immunity of Lieberthal.